**2014 BNH 008   Note:   This is an unreported opinion.  Refer to LBR 1050-1 regarding citation.**
_____

### UNITED STATES BANKRUPTCY COURT
### DISTRICT OF NEW HAMPSHIRE

In re:                                                                                      Bk. No. 13-11016-JMD
                                                                                                   Chapter 7
William J. Blanchard,
           Debtor


William J. Blanchard,
           Plaintiff,

v.                                                                                              Adv. No. 13-1038-JMD

New Hampshire Higher Education Assistance Foundation,
           Defendant

*Alice C. Ranson*
*Elliott, Jasper, Auten & Shklar, LLP*
*35 Main Street*
*Newport, NH*
           *Attorney for Plaintiff-Debtor*

*Clifford Gallant, Jr.*
*Beliveau, Fradette, Doyle & Gallant, PA*
*91 Bay Street*
*Manchester, NH*
           *Attorney for Defendant*

### MEMORANDUM OPINION

**I.  INTRODUCTION**

This matter is before the Court on the Amended Complaint (Doc. No. 17) (the

"Complaint") of William J. Blanchard (the "Debtor" or "Plaintiff") against New Hampshire

Higher Education Assistance Foundation (the "Defendant").  The Complaint requests that the

1

Court enter relief in favor of the Plaintiff, pursuant to § 523(a)(8) of the Bankruptcy Code, and declare that the Defendant's claims – which are on account of educational loans – are dischargeable.  The Court held a trial on the matter on February 6, 2014.  At the end of the trial, the Court ordered the Plaintiff and Defendant to submit written closing arguments.  The parties did so, and the Court took the matter under submission.

This Court has authority to exercise jurisdiction over the subject matter and the parties pursuant to 28 U.S.C. §§ 1334, 157(a), and U.S. District Court for the District of New Hampshire Local Rule 77.4(a).  This is a core proceeding in accordance with 28 U.S.C. § 157(b)(2)(I).

**II.  FACTS**

At the outset of the trial, the parties admitted Plaintiff's Exhibits 1 – 22 and Defendant's Exhibits 101 – 117 by agreement.  The parties' Agreed Statement of Facts (Doc. No. 33) (the "ASF") was also admitted into evidence.  The Debtor was the only witness who testified at the trial.

    **A.**    **The Debtor's Personal Background**

The Debtor is a 45 year old married man with five children, ranging in age from six to sixteen.

Prior to taking out the educational loans at issue in this case, the Debtor had a "GED." The Debtor first used educational loans to finance a general associate's degree in science.  That degree was required before the Debtor could pursue his nursing degrees.  The Debtor then used loans to obtain his Licensed Practical Nurse degree ("LPN"), and later his Registered Nurse

degree ("RN").  The Debtor used the loans to pay for tuition, as well as his room and board.  The Debtor was in school for a total of five years to obtain his RN.  Currently, the Debtor is employed as an emergency room RN at Springfield Hospital in Vermont.  Specifically, the Debtor is a triage charge nurse.  In addition to his employment at Springfield Hospital, the Debtor works on a part-time on-call basis for Maplewood Nursing Home.  The Debtor's testimony indicated that he has worked only two shifts at the nursing home in the past eight or nine months.

The Debtor filed a chapter 7 bankruptcy petition on April 18, 2013 (the "Petition Date").

### B.    The Educational Loans

As a preliminary matter, the parties agree that the loans at issue in this case are the type of loans normally excepted from discharge pursuant to § 523(a)(8) of the Bankruptcy Code.

The ASF lays out a lengthy and detailed history of all the loans the Debtor received from the Defendant or its predecessors-in-interest,[1] including original disbursal amounts, dates and terms of forbearance agreements and deferments, and dates and amounts of all payments.  See ASF ¶¶ 2-55.  For the present purpose, it is sufficient to describe the loans as follows:

Between September 18, 1995 and July 6, 1999, the Debtor received a total of twelve Federal Stafford Loans: six subsidized and six unsubsidized (collectively the "Group C & D Loans").  The total amount disbursed on the Group C & D loans was $27,622.50.  In March and April of 2000, the Debtor applied for and received a Federal Consolidation Loan covering the Group C & D Loans.  The consolidation loan included an $11,292.60 subsidized portion and a

---

[1] For the sake of simplicity, the term "Defendant" will include NHHEAF, its predecessors-in-interest, and whatever lender or servicer the Debtor dealt with in connection with the educational loans at issue in this case.

3

$19,870.87 unsubsidized portion. Both portions bore interest at a fixed 7.5%.

In October of 2001, the Debtor applied for and received one final Subsidized Stafford Loan, in the original amount of $1,697.50 (the "Group B Loan").[2] Accordingly, taking into account the consolidation loan, the total original balance of all of the loans was $32,860.97.

From 2000 to 2013, the Defendant granted the Debtor numerous deferments and forbearances. While the ASF provides a complete payment history, it does not include the total amount the Debtor has paid on account of the loans. The payment history indicates that between forbearances and deferments, the Debtor made consistent payments of the monthly amount due, for periods ranging from a few months to over a year. This applies to both the Group B and Group C & D Loans  The Debtor testified that he has paid a total of "about $20,000." The Defendant did not dispute that testimony, so for the present purpose, the Court finds that the Debtor paid $20,000 on account of the loans.

As of January 14, 2014, the total outstanding balance of the Group B and Group C & D Loans was $52,902.65. ASF ¶75  This is consistent with the Debtor's testimony that the outstanding balance was "about $50,000." Accordingly, over the life of the loans, the Debtor has paid approximately $20,000, but the balance due on the loans has *increased* by approximately $20,000.

According to the Defendant's Exhibit 117, the minimum amount the Debtor could be required to pay each month towards all of the loans, under income based repayment ("IBR"), is $177.23. This is consistent with the Debtor's testimony that he believed the minimum monthly

---

[2] The Debtor used the Group B Loan to obtain his RN, after having worked for a year with his LPN.

4

payment under IBR would be approximately $175.  The Debtor also explained his understanding that he would have to "re-qualify" for IBR on an annual basis, and assuming he did so, the repayment term would be 25 years.  At that time the loans would be deemed paid in full regardless of any then outstanding balance.[3]

The Debtor borrowed a modest amount of money to pursue a degree in nursing.  He obtained a nursing degree and is successfully employed in that field.  He is married and has struggled to support his family for thirteen years while employed full time as a nurse.  During that thirteen year period he has paid what he was able on his student loans and received temporary payment relief under applicable law.  At the end of thirteen years his efforts have appeared to accomplish little beyond the passage of time, as the balance due on his student loans has not decreased in any material way.  The circumstances of this case remind the Court of the chorus to the well known folk song "Sixteen Tons":

> *You load sixteen tons and what do you get?*
> *Another day older and deeper in debt.*
> *Saint Peter don't you call me, 'cause I can't go.*
> *I owe my soul to the company store.*

    **C.**    **The Debtor's Financial Condition and Affairs**

          1.    <u>The Debtor's wife and children</u>

The Debtor and his family live in Claremont, New Hampshire in a 1972 mobile home.  The Debtor owns the mobile home and the land upon which it sits.  The Debtor testified that he has expanded the mobile home over time to accommodate his family.  The Debtor is the only income-earner for his family of seven.  The Debtor's wife, has been a stay-at-home mother for

---

[3] Neither party appears to have considered what federal income tax consequences might result from any such loan forgiveness.

the last fifteen years.  Prior to that, she worked as a bank teller and as a waitress.  Mrs. Blanchard home-schools the family's three youngest children.  She had previously home-schooled the family's two oldest children as well, but they now attend Claremont Christian Academy, a private school.

According to the Debtor's Schedule J, he pays $200 per month for the two oldest children to attend private school.  The Debtor and his wife made the decision to enroll the children in private school one to two years prior to the Petition Date, and the children began attending the private school approximately six months prior to the Petition Date.  The Debtor testified that he and the two children split the cost of tuition.  The children qualified for some scholarships, but not enough to completely cover tuition.  To make up the shortfall, the children work as janitors for the school for an hour each day.  According to the Debtor's testimony, the school pays the children, who then pay the money back to the school.  At this point, the children are paying more towards their tuition – through their work arrangement with the school – than the Debtor.  The Debtor testified that he believes home-schooling the children at this point would be more expensive than sending them to the private school.

According to the Debtor's testimony, the cost of home-schooling the family's three youngest children includes an average of $50 to $75 per month for supplies.  That range appears to include both traditional school supplies, as well as educational materials from online publishers.

The Debtor testified that his wife cannot work outside the home because she home-schools the three youngest children.  The Debtor further testified that it would actually cost more to send the three youngest children to public school, with the additional costs including school

lunches, transportation costs (e.g., additional gas to drive them to and from school), and required school supplies (e.g., calculators).  The Debtor explained his belief that the net financial effect of Mrs. Blanchard returning to work would be negative, in that her earning potential is low, and the additional costs involved in her working outside the home would be more than offset by the increased expenses (e.g., transportation to and from her work, childcare expenses, etc.).

            2.       The Debtor's work history and income

The Debtor testified that he can only "count on" 36 hours of work each week at Springfield Hospital, corresponding to a bi-weekly paycheck of $1,700.  The Debtor's Schedule I indicated that he had monthly gross wages of $5,429.67 and monthly income (after payroll deductions) of $3,907.93.  Ex. 110.  In connection with this adversary proceeding, Debtor's counsel prepared a more detailed analysis of his monthly income, which was admitted as Exhibit 111.  The Debtor testified that the exhibit lists his net monthly income.  The exhibit covers October 2012 to June 2013, and provides an average monthly income for that period of $4,941.51.

The Debtor's tax returns for 2009, 2010, 2011, and 2012 were admitted as Exhibits 105, 106, 107, and 108, respectively.  Those exhibits indicate that the Debtor had adjusted gross income of $71,213 for 2009; $69,599 for 2010; $72,064 for 2011; and $67,594 for 2012.  The Defendant cross-examined the Debtor extensively on the contents of his tax returns and bank statements (Ex. 109).  The Debtor's testimony indicated that he works at a job whose pace, hours, and hourly wage vary, but there was no missing or phantom income that did not appear on

the Debtor's tax returns or bank statements.[4] The Debtor's testimony further indicated that he works additional shifts and outside nursing jobs. Accordingly, the Debtor consistently earns more than the $1,700 bi-weekly, the minimum amount that he can ensure he earns.

        3.      The Debtor's expenses and assets

The Debtor's Schedule J indicated that he had average monthly expenses of $4,081.00, resulting in a monthly net loss of $173.07. Ex. 112. In connection with this adversary proceeding, Debtor's counsel prepared a more detailed analysis of his monthly expenses, which was admitted as Exhibit 115. The exhibit includes an explanation of the various expenses. The exhibit provides that the Debtor's average monthly expenses are $5,209. Comparing Exhibit 111 to Exhibit 115, the Debtor would have an "updated" monthly net loss of $267.49.

The Debtor's testimony indicated numerous areas in which he and his wife work to minimize expenses. Apart from the fact that the Debtor and his family live in an expanded mobile home, whose monthly mortgage payment totals $787, the Debtor's expenses include the following:

The Debtor owns three vehicles, a 2002 Dodge van, a 2000 Saturn station-wagon with 182,000 miles, and a 1994 Chevy Corsica with 224,000 miles. The van is not currently on the road because it needs a muffler and did not pass inspection. The Debtor purchased the station-wagon for $2,500 and it is his wife's vehicle. The Debtor's testimony indicated that he financed

---

[4] The Defendant's cross examination of the Debtor identified several items in the Debtor's primary bank account (Ex. 109) that did not appear to be deposits from wages or payments of routine expenses. The Debtor testified that the deposits and withdrawals were from a mission trip to Africa that the two oldest children did. Each child had to raise $3,000 for the trip, and it appeared that some or all of the money flowed through the Debtor's primary bank account.

8

$1,800 of the purchase price of the station-wagon, with a monthly payment of $150. The Chevy was intended for the Debtor's son, but he does not have his license yet, so the Debtor drives it to work. The Debtor's Exhibits 12, 13, 14, and 15 include receipts for annual vehicle registration, car payments, vehicle repairs, and gasoline.

The Debtor testified that his family shops at three different stores to save money. The Debtor's Exhibit 19 includes receipts for the month of December 2013 for food, groceries, and home supplies. The total of those receipts is $1,788.98, according to a summary at the beginning of the exhibit. The Debtor testified that he drives to Lebanon, New Hampshire to buy "animal feed," which consists of stacks of old bread that the Debtor and his family eat. The Debtor buys his lunches at the subsidized cafeteria at Springfield Hospital, because, according to the Debtor, that is the cheapest option. The Debtor explained numerous other expenses that his family incurs, including clothing, shoes, and sports equipment for his children,[5] as well as heating and utility costs. To save money, the Debtor buys the wood he uses to heat his home directly from a logging truck, and then cuts and splits the wood himself. The Debtor pays a $50 monthly tithe to the family's church, and has done so for 17 years. The Debtor testified that he used to pay a $200 monthly tithe, but reduced the amount when he filed his bankruptcy.

Upon cross-examination from the Defendant, the Debtor explained his expenses in detail. With the exception of a few expenses, the Debtor's testimony indicated that the expenses listed on his Schedule J and documented in his trial exhibits were reasonably accurate. The Court is satisfied that variations between the Debtor's Schedule J and his trial exhibits are due to the

---

[5] The Debtor testified that his children participate in karate classes and tournaments, and the Debtor's testimony indicated that these activities have somewhat variable costs.

9

variability of some of the Debtor's expenses (e.g., heating, auto gas). The Debtor's testimony indicated that he did not "pad" his expenses or "stock-up" in advance of the Petition Date or during the adversary proceeding. The Defendant indicated a few items on the Debtor's Schedule J that were overstated and adjusted on Exhibit 115, including electricity and heating fuel. The Defendant also indicated items that had increased dramatically between Schedule J and Exhibit 115, including food, which increased from $850 on Schedule J to $1,600 on Exhibit 115. The Debtor provided a satisfactory explanation for the discrepancies, and explained that the understated original amount for "food" was due to the fact that the amount did not reflect what the family terms "dry goods" (e.g., toilet paper and similar non-food items).

                4.       <u>The Debtor's prospect for increased income or decreased expenses</u>

The Debtor testified that he is at the highest level he can achieve in nursing without a bachelor's degree, which he does not have. He has worked at Springfield Hospital for six years and did not receive a raise this year. He expects to earn about the same amount he is earning now for the foreseeable future. The Debtor's testimony indicated that his work is physically demanding. According to the Debtor's testimony, he had back surgery a few years ago and has or had a problem with his right ulnar nerve. The Debtor testified that if he became physically unable to perform his duties as an emergency room nurse, he would have few other options for work and does not know what he would do to earn money.

The Debtor's testimony was somewhat unclear, but he may have resigned as a charge nurse recently because he felt he was losing his critical thinking skills. The Debtor explained his opinion that while being a charge nurse is a good "resume booster," it can cause a person to lose his critical care skills.

D.     **The Parties' Positions**

The Debtor argues that he is maximizing his income and minimizing his expenses, but will be unable to maintain a minimal standard of living for himself and his dependents if he is forced to repay his educational loans.

The Defendant argues that the Debtor has understated his income and overstated his expenses. The Defendant identifies several expenses that the Debtor can reduce or eliminate, including the children's private school and the church tithe, and identifies ways for the Debtor to maximize his income, including having his wife return to work instead of home-schooling the family's children. Additionally, the Defendant argues that two of the Debtor's expenses appearing on Exhibit 115, specifically a $100 monthly payment on account of "Claremont Welfare" and a $200 monthly payment on account of "Family Debts (Wife's Name)," unfairly favor payments to other long-term creditors[6] at the Defendant's expense. Under the Defendant's revised expenses, the Debtor will have ample money to maintain a minimal standard of living while repaying his loans in full.

---

[6] The Debtor's testimony indicated that the welfare expense is actually a loan. At the time the Debtor received the loan he did not believe it was a debt, but apparently something akin to a grant or an assistance payment. The Debtor testified that the welfare debt is approximately $2,400 and is secured by a lien in the Debtor's home. According to the Debtor's testimony, interest is compounding on the debt, and while the Debtor has not yet made any payments toward it, he needs to do so some day. With regards to the Debtor's wife's debts, the Debtor testified that they were on account of family expenses the wife incurred on credit cards in her own name. According to the Debtor's testimony, the family is trying to maintain Mrs. Blanchard's credit (this is apparently the reason she was not included in the Debtor's bankruptcy).

**III.  DISCUSSION**

      A.     Section 523(a)(8) and the Applicable Standard

Under § 523(a)(8) of the Bankruptcy Code, a debtor cannot discharge educational loans unless excepting the loans from discharge "would impose an undue hardship on the debtor and the debtor's dependents." The statute does not define "undue hardship," and this Court has generally followed the three-part test for undue hardship set forth in Brunner v. New York State Higher Educ. Servs. Corp., 831 F.2d 395 (2d Cir. 1987). See, e.g., McClain v. Am. Student Assistance (In re McClain), 272 B.R. 42, 47 (Bankr. D.N.H. 2002); Grigas v. Sallie Mae Servicing Corp. (In re Grigas), 252 B.R. 866, 874 (Bankr. D.N.H. 2000). Under Brunner, student loan obligations impose an undue hardship within the meaning of the statute and can be discharged, if:

> A. The debtor cannot maintain, based on current income and expenses, a minimal standard of living for himself and his dependents if forced to repay the loan;
>
> B. Additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loan; and
>
> C. The debtor has made good faith efforts to repay the loan.

Brunner, 831 F.2d at 396; McClain, 272 B.R. at 47; Grigas, 252 B.R. at 874; Garrett v. New Hampshire Higher Educ. Assistance Found. (In re Garrett), 180 B.R. 358, 362 (Bankr. D.N.H. 1995).

Notwithstanding the above cases, this Court has never been fully satisfied with the Brunner standard. As one bankruptcy court put it, when examining the various prevailing standards for undue hardship, Brunner "test[s] too much." Kopf v. U.S. Dept. of Educ. (In re

Kopf), 245 B.R. 731, 741 (Bankr. D. Me. 2000).

In Kopf, Judge Haines provides a detailed analysis of what he determined were the three prevailing views. See id. at 737-745. Incorporating that analysis will streamline this Court's analysis in this case.

### 1. The Three Prevailing Standards as Explained in Kopf

Kopf identifies three primary "tests" for undue hardship: 1) the In re Johnson test[7]; 2) the In re Brunner test; and 3) the "totality of the circumstances" test. Id. at 736-37.

According to Kopf, the In re Johnson test examines a number of facts and circumstances and was designed "to determine whether the debtor's 'future financial resources for the longest foreseeable period of time allowed for repayment of the loan, [would] be sufficient to support the debtor and his dependent[s] at a subsistence or poverty standard of living, as well as to fund repayment of the student loan.' If not, loan repayment would impose an 'undue hardship' on the debtor." Id. at 737-38 (citations omitted). The In re Johnson test adds two other tests, one examining "good faith," and one making a "policy" inquiry. Id. at 738. "To pass the 'good faith test' the debtor must show that he or she had made a 'bona fide attempt to repay the loan.'" Id. (citations omitted). To determine the policy test, a court "must examine the pros and cons of discharging the student loan(s) in light of the policy behind § 523(a)(8) and repealed 20 U.S.C. § 1087-3 (1978): 'to combat the abuse of the bankruptcy laws by recently-graduated students.'" Id. (citations omitted).

This Court will not belabor its analysis of the In re Johnson test. The bankruptcy court in

---

[7] Pa. Higher Educ. Assist. Agency v. Johnson (In re Johnson), 5 Bankr. Ct. Dec. 532 (E.D. Penn. 1979).

Kopf rejected it, and even the Third Circuit Court of Appeals stated that it "appears to be both unnecessarily complicated and unduly cumbersome." Pa. Higher Educ. Assist. Agency v. Faish (In re Faish), 72 F.3d 298, 303 (3d Cir. 1995).

Similarly, this Court will not belabor its analysis of the In re Brunner test. That test has been the prevailing standard in the District of New Hampshire, and the cases cited above provide ample analysis and application of the standard.

In Bronsdon v. Educ. Credit Mgmt. Corp. (In re Bronsdon), 435 B.R. 791, 798-99 (B.A.P. 1st Cir. 2010), a case decided after Kopf, the First Circuit Bankruptcy Appellate Panel explained the totality of the circumstances test, and compared it to the In re Brunner test.

> The totality of the circumstances analysis requires a debtor to prove by a preponderance of evidence that (1) his past, present, and reasonably reliable future financial resources; (2) his and his dependents' reasonably necessary living expenses; and (3) other relevant facts or circumstances unique to the case, prevent him from paying the student loans in question while still maintaining a minimal standard of living, even when aided by a discharge of other prepetition debts. Courts should consider all relevant evidence – the debtor's income and expenses, the debtor's health, age, education, number of dependents and other personal or family circumstances, the amount of the monthly payment required, the impact of the general discharge under chapter 7 and the debtor's ability to find a higher-paying job, move or cut living expenses.
>
> The Brunner test differs, albeit modestly. Brunner requires a three-part showing (1) that the debtor cannot, based on current income and expenses, maintain a minimal standard of living for herself or her dependants if forced to repay the loans; (2) that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans.
>
> One can see readily that insofar as income and expenses are concerned, the tests take converging tacks. The totality test looks to past, present, and future financial resources and necessary living expenses and whether, taken together with other factors, the debtor has the ability to repay while maintaining a minimal standard of living. Brunner asks the same question looking to current income and expenses, then considers whether circumstances inhibiting repayment will endure.

Id. (citations and quotations omitted).

14

The <u>Bronsdon</u> court explains that some courts applying <u>Brunner's</u> second prong (that the state of the debtor's affairs is likely to persist) have unnecessarily inserted a requirement of "unique" or "extraordinary" circumstances (e.g., "debtor's advanced age, illness or disability, psychiatric problems, lack of usable job skills, large number of dependents or severely limited education.")  See <u>id.</u> at 800.  In the absence of those circumstances, a "court may conclude that the debtor has failed the second <u>Brunner</u> prong and the student loans will not be discharged."  <u>Id.</u>  <u>Bronsdon</u> concludes that "the totality of the circumstances test best effectuates the determination of undue hardship while adhering to the plain text of § 523(a)(8)."  <u>Id.</u> at 801.  In support of this result, the Bankruptcy Appellate Panel notes that the First Circuit Court of Appeals "has endorsed the totality of the circumstances approach in related bankruptcy settings."  <u>Id.</u> at 801 n.15.

In the present case, this Court does not think the result would be different between the totality of the circumstances test and the <u>Brunner</u> test.  However, to the extent the <u>Brunner</u> test has been read to require some "certainty of hopelessness," the Court agrees with <u>Bronsdon</u> that such a requirement is not supported by the text of the Bankruptcy Code.  See <u>id.</u> at 801.  Moreover, as explained below, the Debtor has made a good faith effort to repay the loans, and while this satisfies the third prong of <u>Brunner</u>, it is also certainly a relevant factor in a totality of the circumstances inquiry.  Accordingly, the Court finds this is an appropriate juncture to adopt the totality of the circumstances test.

      **B.**    **The Burdens of Proof and Production**

The creditor bears the initial burden of proving the existence of the debt and that the debt is of the type excepted from discharge under § 523(a)(8).  <u>Educ. Credit Mgmt. Corp. v. Savage</u>

(In re Savage), 311 B.R. 835, 839 (B.A.P. 1st Cir. 2004) (citation omitted).  Once the creditor satisfies that burden, the burden shifts to the debtor to prove undue hardship by a preponderance of the evidence. Id.; see also Grogan v. Garner, 498 U.S. 279 (1991).  After the debtor makes a showing that would support an undue hardship determination, the burden of production – the duty of going forward with evidence – shifts to the creditor to present some evidence to rebut the debtor's prima facie case.  Votruba v. Florida Dep't of Educ. (In re Votruba), 310 B.R. 698, 704 (Bankr. N.D. Ohio 2004).

Here, the parties do not dispute the existence of Group B and Group C & D loans or that the loans fall under § 523(a)(8). Accordingly, the Debtor has the burden to prove undue hardship by a preponderance of the evidence.

**C.  Analysis**

Under the totality of the circumstances test, the Court will examine the Debtor's past, present, and future financial resources and necessary living expenses and whether, taken together with other factors, the Debtor has the ability to repay the loans at issue while maintaining a minimal standard of living.  See Bronsdon, 435 B.R. at 798.

Viewing the Debtor's family's income and expenses as a whole, it is nearly impossible to identify any area where the Debtor could significantly increase his income or decrease his expenses.

1. The Debtor's Family's Income

The Debtor's testimony indicated that his income has reached something of a ceiling.

Without a bachelor's degree,[8] and given that the Debtor did not receive a raise in the past year, it does not appear that the Debtor can reasonably expect significant raises in the future. In the absence of any evidence to the contrary, the Court accepts the Debtor's contention that he will earn about the same amount he is earning now for the foreseeable future. By all accounts, the Debtor is hard working, and seeks to maximize his income through additional shifts and outside work, to the extent he is able.

Moreover, there is no evidence to refute the Debtor's testimony that the net financial effect of his wife returning to work would be negative. The Debtor and his family live in a relatively rural area. His wife has not worked outside the home for fifteen years. There is no evidence before the Court regarding Mrs. Blanchard's qualifications for any particular field or role, and no evidence regarding what salary Mrs. Blanchard could expect to earn if she were able to secure work. In light of the above, the Court concludes that Mrs. Blanchard's election not to work, and to instead home-school the family's younger children, does not have a significant effect on the family's net income, and likely helps to minimize the family's expenses.

The Debtor's tax returns indicate that his income has been relatively steady in the recent past, and the Debtor's testimony indicates that state of affairs is unlikely to change at any time in the foreseeable future. The Debtor is 45 years old, works in a physically demanding field, and has had injuries or physical overuse issues in the past that hampered his ability to work. There is nothing in the evidentiary record to support a finding that the Debtor will be able to work at his current physically demanding job, plus part time work, at his current pace for the indefinite

---

[8] It is ironic that the Debtor's income might be higher if he had obtained a bachelor's degree, but that result would likely have involved additional educational debt.

future. Similarly, no evidence supports any finding that the Debtor's income is likely to increase in any material way in the foreseeable future.

### 2. The Debtor's Family's Expenses

Viewed in light of the Debtor's specific personal and professional circumstances, and viewed as a whole, the Debtor appears to have pared his expenses to a minimum. Some of the Debtor's expenses are exceptionally low. For example, $787 per month for a mortgage payment for a family of seven is among the lowest values the Court has seen. Similarly, the Debtor's budget of $1,600 per month for food and home supplies for a family of seven is quite modest. Moreover, the Debtor's election to purchase old bread labeled "animal feed" indicates to the Court that the Debtor has gone to great lengths to minimize his expenses.

The Debtor's two oldest children attend private school. The cost to the Debtor of $200 per month is low in the context of public education, and very low in the context of private education. The fact that the Debtor's children contribute more to their tuition than the Debtor does further indicates that the Debtor (and his family) have made and continue to make efforts to keep the family's expenses as low as possible.

With regard to the Debtor's welfare debt, the Debtor's testimony indicated that he is not currently making payments toward this debt but needs to in the future. Because the amount of the debt is increasing and the debt is secured by a lien in the Debtor and his family's home, eventually paying this debt appears to be a matter of necessity, or the Debtor might risk losing his home.[9] With regard to payments on account of the Debtor's wife's debts, these are almost

---

[9] The parties did not address whether the welfare debt would be discharged in the Debtor's bankruptcy. Even if the Debtor's personal obligation of the debt is discharged, it appears almost certain that the lien in the Debtor's home would "ride-through," and the creditor

certainly unaffected by the Debtor's bankruptcy. Accordingly, they will remain due and owing, and are a family expense. Failing to service these debts might result in collection actions against the Debtor's wife or the family's property. Accordingly, the Court does not find that payments on account of the welfare debt and the wife's debts are unreasonable, and for the reasons just stated, appear to be necessary to maintaining a minimal standard of living for the Debtor's family.

Thus, viewed as a whole, the Court is unable to identify any expenses that are excessive or could be significantly reduced. In addition, several categories of expense are *below* a minimal standard of living. There is no evidentiary basis for the Court to find that the Debtor's expenses will decrease in the foreseeable future. While some hypothetical future circumstances (e.g., the Debtor's oldest children graduating from high school and moving out of the family home) might decrease some of the Debtor's expenses, other hypothetical future circumstances (e.g., the Debtor requiring additional medical care as he ages, the Debtor's aging mobile home needing expensive repairs or upgrades, the Debtor's older, high-mileage cars needing repairs or replacement) would do the opposite.

### 3. The Debtor's Efforts to Repay the Loans

The payment history provided in the ASF, along with the Debtor's testimony, indicates that the Debtor has made a good faith effort to repay loans over a period in excess of ten years. While the Debtor has applied for and been granted deferrals and forbearances, he appears to have made payments of the amounts due on a timely basis. However, in spite of his efforts, the balance of the loans has not materially decreased.

---

would thus maintain its *in rem* rights against the Debtor's home.

None of the testimony or evidence suggests that the Debtor has attempted to shirk his obligations to the Defendant or that the Debtor has sought an easy way out. To the contrary, it appears that the Debtor has attempted to repay the loans to the extent he was able, but he has been unsuccessful in substantially reducing the balance due on the loans.

## IV.  CONCLUSION

Under the totality of the circumstances, the Court finds that the Debtor does not have the ability to repay the loans at issue in this case while maintaining a minimal standard of living. Accordingly, judgment shall enter for the Debtor discharging his student loans.

This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.  A separate order and judgment shall be entered.

ENTERED at Manchester, New Hampshire.

Date:   August 14, 2014                       /s/ J. Michael Deasy
                                              J. Michael Deasy
                                              Bankruptcy Judge